IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Diane Nelson, | ) | C/A No.: 1:12-1050-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I.     Relevant Background

    A.     Procedural History

On April 17, 2006, Plaintiff filed an application for DIB in which she alleged her disability began on June 10, 2003.[2]  Tr. at 233–35.  Her application was denied initially (Tr. at 92), upon reconsideration (Tr. at 94), and, after an administrative hearing on March 4, 2009, by Administrative Law Judge ("ALJ") William F. Pope on May 27, 2009 (Tr. at 99–109).  On October 30, 2009, the Appeals Council granted Plaintiff's request for review and remanded the case for further proceedings.  Tr. at 110–113.  After a supplemental hearing on May 25, 2010 (Tr. at 28–50), the ALJ issued an unfavorable decision on June 16, 2010, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 11–22.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 18, 2012.  [Entry #1].

    B.     Plaintiff's Background and Medical History

        1.     Background

Plaintiff was 50 years old at the time of the hearing.  Tr. at 233.  She completed the twelfth grade and some nursing assistant training.  Tr. at 271.  Her past relevant work

---

[2] Plaintiff previously applied for DIB and SSI in 1996, alleging disability beginning February 15, 1995.  Tr. at 11.  The applications were denied on February 28, 1997, and no further appeal was made.  *Id.*

("PRW") was as a gate guard, accounts payable clerk, nursing home residential assistant, and proof operator supervisor.  Tr. at 84–87.  She alleges she has been unable to work since June 10, 2003.  Tr. at 233.

### 2.    Medical History

On July 13, 2003, Plaintiff visited the emergency room with complaints of lower back pain radiating down her left leg to her foot.  Tr. at 335.  She reported that the pain began after physical therapy treatment for a strained muscle in her right lower back.  *Id.*  She was diagnosed with sciatica, possibly exacerbated by the physical therapy, and provided with pain medication.  *Id.*  The physician noted that Plaintiff was neurologically intact and received good relief with the pain medication.  *Id.*

Plaintiff saw William Felmly, M.D., of the Moore Orthopaedic Clinic on August 28, 2003.  She reported increasing pain and discomfort in her back and legs, particularly on the left side.  Tr. at 343.  She stated that her back pain improved slightly with therapy, but her leg pain persisted.  *Id.*  Following examination and x-rays, it was Dr. Felmly's impression that Plaintiff had forward slippage of her vertebrae (spondylolisthesis without lysis) at L5-S1 with clinical evidence of disc extrusion into the spinal canal (far lateral foramen), the left greater than the right, but without nerve root impingement (radiculopathy).  Tr. at 344.  When compared with a 1995 MRI, the x-rays demonstrated significant changes at L5-S1 and notable left and right foraminal changes.  *Id.*  Dr. Felmly recommended treatment with injections and medication.  Tr. at 345.

On September 25, 2003, Plaintiff reported that an injection had helped the pain, that she still had some back symptoms, and that she was not having any problems with her legs. Tr. at 342. Dr. Felmly recommended a second injection and opined that if Plaintiff's leg pain was eliminated long-term, she could potentially manage her back pain through exercise and return to employment. *Id.* On October 9, 2003, Plaintiff returned for a follow-up visit, and Dr. Felmly noted that she seemed to be doing better. Tr. at 341. They discussed Plaintiff returning to work; however, she stated that she was unemployed. *Id.* Dr. Felmly opined that she could seek a job in the light to medium exertion range with no lifting over 50 pounds and no pushing over 100 pounds, and stated that he did not see any evidence suggesting that Plaintiff could not return to work. *Id.*

In November 2003, Dr. Felmly observed that Plaintiff seemed to be doing pretty well, and Plaintiff reported that her back was functioning well. Tr. at 340. She exhibited good range of motion and good sensory and motor function in her legs, and she could flex and extend her legs without difficulty. *Id.* Dr. Felmly suggested that Plaintiff return to regular activities and duties without limitations and opined that she could find employment consistent with her previous level of employment. *Id.* He found no clinical evidence of "any type of impairment or any type of significant residual disability or impairment" related to Plaintiff's back pain. *Id.*

In March 2004, Plaintiff reported some pain in her legs and lower back with flexion and extension, but the x-rays showed no specific changes from the previous x-rays. Tr. at 339. Although Dr. Felmly advised her that surgery might be necessary,

4

Plaintiff indicated that she was not ready to consider surgery, and she elected to have conservative treatment including injections, medications, and physical therapy. *Id.* Plaintiff received an injection in April 2004, but in May 2004 she reported that it had not helped the pain. Tr. at 337. She stated that she did not want surgery or further injections. *Id.* Plaintiff also reported that she was caring for a six-month-old baby and a two-year-old child, and Dr. Felmly observed that she "functioned at a fairly high level as she [was] able to take care of two young children." *Id.* He further noted that her activity and movements appeared fairly normal and observed that she was able to pick up the children, push a carriage, and take care of the children's needs. *Id.* It was Dr. Felmly's opinion that he could offer Plaintiff no further treatment and that she was at maximal medical improvement. *Id.* He assigned a five percent partial/permanent impairment of her lumbosacral spine due to the forward slippage at L5-S1. *Id.* He stated that she was released back to whatever employment she felt comfortable with, but noted that she had been laid off from her job. *Id.*

In July 2004, Plaintiff saw Scott B. Boyd, M.D., of Columbia Neurosurgical Associates for low back pain radiating into both legs. Tr. at 352. Plaintiff reported that her first epidural injection seemed to help, but caused her to have elevated glucose levels, and that physical therapy had made things worse. *Id.* Examination revealed mild back tenderness and some back pain with range of motion, but normal tone, power, and coordination in her extremities. *Id.* After an MRI showed significant degenerative change at L5-S1, Plaintiff elected to undergo surgical fusion of her lumbar spine in

August 2004.  Tr. at 348–51.  After surgery, Plaintiff continued to have low back pain and a CT scan indicated that the fusion had failed.  Tr. at 374.  Therefore, Plaintiff elected revision surgery in December 2004.  Tr. at 373–79.  Treatment notes indicated that her left leg felt good after the surgery and that she had good strength in both legs. Tr. at 373.

In January 2005, Plaintiff reported to Dr. Boyd that she was doing quite well and that her left leg pain was much better, with the sharp pain completely eliminated.  Tr. at 426.  She stated that her back still bothered her with activity, but was improving.  *Id.*  Dr. Boyd found that she had "good power" in her legs and that she had made good progress, but was not yet ready to return to work.  *Id.*  In February 2005, Plaintiff reported that she was improving and stated that the sharp pain down her leg was gone.  Tr. at 425.  She stated that she still had some stiffness in her back and had trouble walking long distances. *Id.*  Dr. Boyd noted that her nerve root (radicular) pain was almost resolved and that her back pain was also improving.  *Id.*  He stated that he would see her back in two months, at which time they would start discussing her return to work.  *Id.*  X-rays on February 21, 2005, demonstrated the screws from Plaintiff's fusion were in a stable position.  Tr. at 417.  In May 2005, Dr. Boyd noted that Plaintiff continued to improve and that she seemed to be getting stronger.  Tr. at 424.  He further noted that she still had a tough time standing and lifting anything more than a few pounds.  *Id.*  X-rays showed good positioning of the graft in her spine, and Dr. Boyd opined that she could return to light duty work in three months.  *Id.*  In July 2005, Dr. Boyd found improvement in Plaintiff's

leg strength and advised her that she could return to part-time work with some restrictions.  Tr. at 423.

In November 2005, Plaintiff reported that her back pain was relieved, but that she continued to have pain in her legs with exertion.  Tr. at 422.  Dr. Boyd noted that she did not have any tenderness along her back, but found she had a slightly positive right straight leg raise and had a lot of difficulty getting up from a chair and standing.  *Id.*  X-rays showed good positioning of the graft.  Tr. at 421.  Plaintiff reported that she was happy with the results of the surgery, but disappointed that her back and legs were not stronger.  Tr. at 422.  Dr. Boyd opined that, although Plaintiff had made steady but slow progress over the year since her second surgery, she had reached a plateau.  *Id.*  He opined that she would not be able to return to any sort of meaningful work and released her to work for two to three hours a day with frequent breaks, no overhead work, no lifting greater than 10 pounds, and no stooping, bending, or straining.  *Id.*  He also opined that her concentration would be affected, assigned a 28 percent whole-person impairment rating, and noted that he would support her applying for disability.  *Id.*

Plaintiff was also treated by various physicians at Family Preventive Medicine ("FPM")[3] between May 2004 and January 2007, for hypertension, non-insulin dependent diabetes, depression, anxiety, and routine medical complaints.  Tr. at 434–74, 500–34,

---

[3] In addition to the medical records from FPM, the record contains medical records from Palmetto Health Richland Family Medicine Center ("PHRFMC").  FPM and PHRFMC are noted to have the same address and the formatting of their records is the same.  Thus, the undersigned concludes that FPM and PHRFMC are the same provider and refers to the records as FPM throughout this summary to eliminate confusion.

559–80.  On November 19, 2004, Plaintiff presented with a slightly anxious affect and bradykinetic gait.  Tr. at 443.  On May 3, 2005, she was seen for abdominal cramps.  Tr. at 445.  On August 22, 2005, Plaintiff complained of neck pain and stiffness, right elbow pain, and radiation of pain into her shoulder for the prior three weeks.  Tr. at 449.  She exhibited some tenderness in her neck and right elbow that worsened with wrist extension and grip with arm extended.  Tr. at 450–51.  On March 30, 2006, Plaintiff reported that she was doing very well with her depression and was trying to stop taking Paxil.  Tr. at 468.  On April 25, 2006, the provider noted that Plaintiff was not currently experiencing pain and did not experience chronic pain.  Tr. at 470.

In May 2006, Plaintiff reported indigestion (dyspepsia) and, after an intestinal biopsy, she was diagnosed with moderate, chronic non-specific gastritis.  Tr. at 609.  On May 18, 2006, Plaintiff reported that Nexium alleviated her indigestion, but her insurance would not cover the medication.  Tr. at 505.

In August 2006, Plaintiff reported numbness and tingling in her feet and cramping in her legs.  Tr. at 515.  She stated that the pain was similar to the pain associated with her prior back surgery, but not as severe.  Tr. at 516.  On examination, Plaintiff demonstrated a normal gait and normal range of motion and strength.  Tr. at 518.  X-rays revealed hardening (sclerosis) of the facet joints at L4-L5 and demonstrated that Plaintiff's forward slippage (spondylolisthesis) was stabilized by the surgical screws at L5-S1.  Tr. at 536.

In June 2006, Monica Rawlinson, M.D., of FPM noted that Plaintiff had been diagnosed with depression, but was not taking any psychotropic medication. Tr. at 500. She further noted that Plaintiff's concentration was good, her memory was adequate, and she did not have any functional limitations due to her depression, nor limitations in her activities of daily living ("ADLs"), social functioning, or ability to complete tasks. *Id.*

In June 2006, state-agency consultant James Weston, M.D., completed a Residual Functional Capacity ("RFC") Assessment and opined that Plaintiff retained the ability to do light work, but was limited to frequent balancing and occasional climbing, stooping, kneeling, crouching, and crawling. Tr. at 476–84. In addition, state-agency consultant Kevin King completed a Psychiatric Review Technique ("PRT") and opined that Plaintiff had a non-severe history of depression and anxiety with mild restriction of daily activities and mild difficulties in maintaining social functioning, concentration, persistence, or pace. Tr. at 484–97.

In August 2006, Plaintiff began taking Lexapro for her depression. Tr. at 521. In September, she reported that she was having heartburn and palpitations that she thought were related to the Lexapro. Tr. at 531. She stated that Xanax had previously made her sick, Zoloft made her sleepy, and Prozac made her feel like a zombie. *Id.*

In October 2006, Plaintiff returned to FPM complaining of reflux. Tr. at 560. She was noted to have chronic back pain, but had a normal gait and no depression or anxiety. Tr. at 561. She also complained of sharp abdominal pain, but was noted not to be experiencing chronic pain. Tr. at 578. Also in October 2006, Dr. Rawlinson reported

that Plaintiff started taking Zoloft in September 2006 and had also tried Lexapro and Prozac. Tr. at 501. Dr. Rawlinson stated that the medications helped Plaintiff's depression and she found that Plaintiff's mental evaluation was normal except for a flat mood and affect. *Id.* Dr. Rawlinson found no work-related limitations in functioning attributable to Plaintiff's depression. *Id.*

On October 19, 2006, state-agency consultant Edward Waller completed a PRT of Plaintiff. Tr. at 537–50. Dr. Waller's assessment mirrored that of Mr. King. State-agency consultant Richard Weymouth, M.D., completed an RFC Assessment and found that Plaintiff retained the ability to perform light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Tr. at 551–58.

Plaintiff visited the emergency room complaining of chest pain on November 27, 2006. Tr. at 594. On examination, she was noted to have a normal affect and to be able to move all extremities well. Tr. at 595. A CT scan revealed no evidence of pulmonary embolus and chest x-rays were normal. Tr. at 597, 599. Plaintiff had good relief of her chest pain after taking four baby aspirin. Tr. at 595–96.

On November 29, 2006, Plaintiff followed up with FPM for her chest pain. Tr. at 570. She reported that the chest pain resolved on its own and stated that she had not had any problems since going to the ER. *Id.* She also denied back pain, joint pain, joint swelling, and muscle weakness and exhibited normal range of motion and strength in her legs. Tr. at 571.

10

Plaintiff started treatment at the Eau Claire Cooperative Health Centers ("ECCHC") on March 20, 2007, for complaints of swelling in her feet. Tr. at 692. Examination revealed elevated blood pressure and blood sugar, but otherwise normal findings. Tr. at 692–94. Plaintiff was advised of the importance of diet and exercise and carefully following her treatment regimen. Tr. at 694. On March 28, 2007, she complained of pain in her hip, abdomen, leg, and foot, but her physical examination produced normal results. Tr. at 688. In May 2007, she again reported abdominal pain, and she was referred to a specialist for examination of her stomach and esophagus. Tr. at 685, 687. The endoscopy showed reflux in Plaintiff's esophagus, but was otherwise normal. Tr. at 686. On May 17, 2007, she reported that Nexium was helpful in treating her reflux, but was not covered by her insurance. Tr. at 683.

In June 2007, Plaintiff was seen in the ER for low back pain following a motor vehicle accident. Tr. at 611. She was diagnosed with back pain and muscle spasm and was released the same day. Tr. at 612–13.

On November 19, 2007, physician's assistant C. Stewart Darby completed an arthritis RFC questionnaire for Plaintiff. Tr. at 616. He assessed Plaintiff with back and hip impairments, and stated that her prognosis was poor due to moderately severe pain in her back and hips. *Id.* He identified a reduced range of motion in Plaintiff's hip, and stated that she had abnormal posture and muscle spasms. Tr. at 617. Mr. Darby further opined that Plaintiff's pain would often interfere with her attention and concentration, that she was incapable of even low stress jobs, and that her medications would cause

11

dizziness.  Tr. at 617–18.  He indicated that Plaintiff would not be able to walk one city block without resting, and that she could sit for at least 30 minutes and up to one hour, stand for 30 minutes, and sit and stand/walk for a total of less than two hours each in an eight-hour day.  Tr. at 618–19.  He further noted that Plaintiff would occasionally need to take unscheduled breaks and should avoid noise, heat, wetness, and humidity.  Tr. at 619–20.

On February 16, 2008, Plaintiff complained of cough and congestion, and neck and shoulder pain on the right side.  Tr. at 681.  Physical examination revealed decreased range of motion in Plaintiff's neck and right shoulder, and x-rays showed mild to moderate degenerative changes at C4-5 and very mild right joint degenerative change in Plaintiff's right shoulder, but no acute abnormalities.  Tr. at 682, 679–80.  On February 21, 2008, Plaintiff presented for a routine check-up, at which her examination produced no abnormal findings, and she was counseled about the importance of diet, exercise, and complying with her treatment and medication regimen.  Tr. at 678.

In March 2008, Plaintiff complained of stomach pain, constipation, and reflux.  Tr. at 673.  She had a colonoscopy on April 22, 2008, which revealed findings consistent with diverticulosis and internal hemorrhoids.  Tr. at 667–68.

Plaintiff was referred to Anthony Elkins, M.D., in June 2008 for treatment of gasotroesophageal reflux disease ("GERD").  She complained of reflux symptoms despite treatment with Nexium and other medications.  Tr. at 657.  She admitted to a sedentary lifestyle and denied any weight loss.  *Id.*  On examination, she was in no acute

12

distress, weighed 217 pounds, and had normal blood pressure.  *Id.*  She demonstrated no neurological deficits and her muscle strength was 5/5 bilaterally.  *Id.*  Dr. Elkins' impression was chronic GERD.  Tr. at 658.  An endoscopy on June 16, 2008, showed evidence of non-erosive reflux disease, and Plaintiff was directed to follow an anti-reflux diet and to take Nexium and Zantac.  Tr. at 656.  On July 3, 2008, Plaintiff reported that Nexium had partially relieved her symptoms, but that Zantac had not provided any relief.  Tr. at 655.  An ultrasound revealed fatty liver disease, but no other abnormal findings (Tr. at 647), and a liver/gallbladder test (HIDA scan) produced normal results (Tr. at 648).  On July 17, 2008, Plaintiff complained of stomach pain and nausea.  Tr. at 547.  Test results were normal, and she was counseled on the importance of weight loss and diet changes.  *Id.*

On August 29, 2008, Plaintiff visited ECCHC complaining of abdominal pain and discomfort.  Tr. at 661.  She stated that she had seen Dr. Elkins, but that he had failed to follow up with her.  *Id.*

In November 2008, Plaintiff returned to ECCHC complaining of muscle spasms in her left shoulder.  Tr. at 659.  Her physical examination was normal, and she was counseled on the importance of compliance with diet and exercise.  Tr. at 660.  In April 2009, Plaintiff complained of diarrhea and abdominal pain and was again prescribed Nexium.  Tr. at 751.  Plaintiff was seen at ECCHC in May, June, July and September of 2009, reporting symptoms such as cough and post nasal drip, but her physical examinations were generally unremarkable.  Tr. at 735–36, 738–39, 743–44, 746–47.  In

13

January 2010, Plaintiff complained of numbness in her fingers, foot pain, and back pain. Tr. at 726. On examination, Plaintiff exhibited some tenderness along the spine, but had a full range of motion and normal strength and stability in her extremities. Tr. at 726–27.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the first hearing on March 4, 2009, Plaintiff testified that she had been divorced for five years, and that she lived with her great grandchildren, ages seven and five. Tr. at 56–57. Plaintiff stated that the children had lived with her since birth. Tr. at 57. She stated that her daughter and her mother helped care for the children. Tr. at 78–79. Plaintiff testified that she had a nursing assistant certification and a certificate in banking Tr. at 58. She testified that her prior work included accountant, nursing home manager, security guard, and check processor at a bank. Tr. at 60–64. Plaintiff stated that she stopped working when she injured her back at work in 2003. Tr. at 64–66. She stated that her worker's compensation settlement was about two years after her back surgeries, and she received about $109,000. Tr. at 66. Plaintiff testified that she had two surgeries in 2004 and that, after the second surgery, she continued to have pain in her hip, lower back, and legs. Tr. at 67–68. She stated that she could not bend or stoop. Tr. at 68. She also stated that she had numbness in her feet and fingers, headaches, diarrhea two to three times a week, and diverticulitis. Tr. at 69, 80. Plaintiff testified that she began having neck pain in 1990, well before she quit working, and that she saw a chiropractor for

14

treatment.  Tr. at 74.  She stated that she was unable to work because she was always in pain, and she was unable to even lift a gallon of milk.  Tr. at 80.  She testified that her diabetes was "pretty much controlled" with oral medication and that she did not require insulin injections.  Tr. at 71–72.

At the supplemental hearing on May 25, 2010, Plaintiff testified that she had been divorced for six years and that she lived with her great grandchildren, ages six and seven. Tr. at 33–34.  She stated that she injured her back while working and the injury was treated with injections, but they caused her blood sugar to increase and left surgery as her only option.  Tr. at 35–36.  Plaintiff testified that her back pain improved after Dr. Boyd performed her second surgery, but she continued to have pain running down her left leg into her foot.  Tr. at 36–39.  Plaintiff stated that she had not seen another neurosurgeon since ending treatment with Dr. Boyd.  Tr. at 39.  She testified that she had taken Darvocet for pain since 2004 and that it caused the side effects of sleepiness and diarrhea. Tr. at 41.  She also testified that, since the surgeries, she had problems with memory and concentration.  Tr. at 42.  Plaintiff stated that she could not sit or stand for too long and that her best position was lying down.  *Id.*  She stated that she spent 75% of her day lying down.  Tr. at 45.  Plaintiff stated that lifting her arms and legs caused pain in her back, and that bending was difficult.  Tr. at 43–44.  She testified that she could sit for 20 to 30 minutes before needing to stand, and could stand for 20 to 30 minutes.  Tr. at 44.  When asked about a typical day in her life, Plaintiff stated that she bathed herself, prepared food for herself and the children, and did some minor cleaning.  Tr. at 42.  She said she spent

15

most of the time in the restroom.  *Id.*  She stated that the children could "pretty much take care of themselves," but that her mother and sister helped with them when they were young.  Tr. at 42–43.  She noted that after her surgery, she lived with her daughter until 2007.  Tr. at 43.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Joel Leonard testified at the first hearing.  Tr. at 81.  The VE categorized Plaintiff's PRW as a gate guard as light, semi-skilled work; as an accounts payable clerk as sedentary, skilled work; as a nursing home residential assistant as medium, semi-skilled or light, skilled work; and as a proof operator supervisor as sedentary, skilled work.  Tr. at 84–87.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry no more than 20 pounds occasionally and 10 pounds frequently; never stand or walk over six hours in an eight-hour workday; occasionally stoop, twist, crouch, kneel, and climb ramps or stairs; and never crawl, balance, or climb ladders or scaffolds.  Tr. at 87.  The VE testified that the hypothetical individual could not engage in Plaintiff's PRW as performed, but could work as an accounts payable clerk, security guard, and proof operator supervisor, as those jobs are performed in the national economy.  Tr. at 88–89.  Plaintiff's counsel then asked the VE to assume a hypothetical individual of Plaintiff's vocational profile who could work two to three hours a day with frequent breaks; could not do any overhead work or lift greater than 10 pounds; could not stoop, bend, or strain; and had impairments to concentration.

Tr. at 90.  The VE responded that the hypothetical individual would not be able to perform Plaintiff's PRW or any work in the national economy.  *Id.*

At the supplemental hearing on May 25, 2010, VE William Stewart testified that he agreed with the testimony of the prior VE regarding the extertional and skill levels of Plaintiff's PRW.  Tr. at 47.  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who could lift or carry no more than 20 pounds occasionally and 10 pounds frequently; stand or walk no more than six hours in an eight-hour workday; occasionally stoop, twist, crouch, kneel, and climb stairs or ramps; and never crawl, balance, or climb ladders or scaffolds.  *Id.*  The VE stated that the hypothetical individual would be able to perform Plaintiff's PRW as a gate security guard, accounts payable clerk, and proof operator, as those jobs are normally performed in the national economy.  Tr. at 47–48.  Plaintiff's counsel then asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was incapable of low-stress jobs due to persistent pain; could walk less than a city block with rest; could sit for 30 minutes to one hour at a time; could stand for 30 minutes at a time and no more than two hours in an eight-hour workday; and would sometimes take unscheduled breaks.  Tr. at 49.  The VE stated that the individual would not be able to perform Plaintiff's PRW.  *Id.*

## 2.    The ALJ's Findings

In his decision dated June 16, 2010, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 10, 2003 through her date last insured of December 31, 2009 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairment: back pain secondary to degenerative disc disease and spondylolisthesis status post back surgery (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform work with restrictions which require no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing and/or walking over 6 hours in an 8-hour workday; only occasional stooping, twisting, crouching, kneeling, and climbing of stairs or ramps; no crawling, balancing, or climbing of ladders or scaffolds.

6.    Through the date last insured, the claimant was capable of performing past relevant work as an accounting clerk (DOT# 216.482-010) as generally performed in the national economy. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from June 10, 2003, the alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(f)).

Tr. at 13–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ did not properly evaluate the opinions of Plaintiff's treating physician, Dr. Boyd, and treating physician's assistant, Mr. Darby;

2)    The ALJ's RFC analysis was improper because he failed to complete a function-by-function assessment; and

18

3)    The ALJ failed to properly evaluate Plaintiff's ability to perform her PRW.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–

---

[4]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5]  In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physician and Physician's Assistant

a.    The Opinion of Dr. Boyd

Plaintiff argues that the ALJ failed to properly evaluate the opinion of Dr. Boyd. [Entry #17 at 31–34]. There is no dispute that Dr. Boyd is a treating physician. If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-

22

2p; *see also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner].” *Craig*, 76 F.3d at 589.

On November 17, 2005, Dr. Boyd opined that, although Plaintiff had made steady but slow progress over the year since her second surgery, she had reached a plateau.  Tr. at 422.  He opined that she would not be able to return to any sort of meaningful work and released her to work for two to three hours a day with frequent breaks, no overhead work, no lifting greater than 10 pounds, and no stooping, bending, or straining.  *Id.*  He also opined that her concentration would be affected, assigned a 28 percent whole-person impairment rating, and noted that he would support her applying for disability.  *Id.*

The ALJ found that Dr. Boyd’s opinion was not supported by his own objective clinical findings or those of Plaintiff’s other physicians.  Tr. at 21.  In so finding, the ALJ referenced Dr. Boyd’s record dated February 21, 2005, which noted that Plaintiff’s radicular pain had nearly resolved following her second back surgery and that her back had improved.  *Id.*  The ALJ further referenced x-rays documenting good positioning of Plaintiff’s graft in May 2005 and Dr. Boyd’s record dated July 21, 2005, which indicated that the strength in Plaintiff’s left leg had improved and she would likely be able to return to light duty.  *Id.*  Finally, the ALJ noted that on November 21, 2005 (the date Dr. Boyd rendered his opinion), Plaintiff reported that she was happy with the results of the surgery, but disappointed that her back and legs were not as strong as she considered normal.  *Id.*

24

Plaintiff contends the ALJ erred by failing to discuss evidence in Dr. Boyd's records that support her claim of disability, including an x-ray dated November 17, 2005, that revealed anterolisthesis that remained unchanged after Plaintiff's second surgery. [Entry #17 at 32–34]. The Commissioner responds that in light of Dr. Boyd's treatment notes, the medical evidence of record, and Plaintiff's ADLs, the ALJ reasonably discredited Dr. Boyd's opinion. [Entry #18 at 16–19].

Before discounting Dr. Boyd's opinion, the ALJ completed a detailed summary of Plaintiff's medical history in his RFC analysis. Tr. at 15–19. The summary included reference to Dr. Boyd's records, as well as those of all of Plaintiff's other treating physicians. Following that summary, the ALJ concluded as follows: "[t]he evidence does not show strength deficits, no signs of muscle atrophy or dystrophy. There have been no neurological or sensory deficits noted on examinations and the claimant has not required any additional surgery secondary to her back impairment." Tr. at 21. The ALJ went on to discuss Plaintiff's ADLs, including caring for two young children since their births. *Id.* Against this backdrop, the ALJ discussed Dr. Boyd's opinion, referencing specific records that were inconsistent with the doctor's assessment of Plaintiff's functional limitations. *Id.* The undersigned concludes that the ALJ's reason for discounting Dr. Boyd's opinion is apparent from his opinion.

The court finds unavailing Plaintiff's argument that the ALJ erred by failing to reference specific medical evidence in his decision. It is "widely held that ALJs are not

required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision." *Mellon v. Astrue*, No. 4:08–2110, 2009 WL 2777653, *13 (D.S.C. August 31, 2009) (citing *Phillips v. Barnhart*, 91 Fed. Appx. 775, 780 n. 7 (3rd Cir. 2004) (ALJ's "mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decison . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole")).

For the foregoing reasons, the undersigned recommends a finding that the ALJ adequately evaluated the opinion of Dr. Boyd.

### b.     The Opinion of Mr. Darby

Plaintiff also argues that the ALJ failed to properly evaluate the opinion of Mr. Darby, a physician's assistant.  [Entry #17 at 35–36].  Plaintiff concedes that Mr. Darby is not an acceptable medical source ("AMS"), but argues that an opinion from a source other than an AMS may outweigh the opinion of an AMS under certain circumstances.

[Entry #19 at 4–5].  Defendant correctly states that an ALJ's discussion of an "other source" opinion, such as Mr. Darby's, must be specific enough to "allow[] a claimant or subsequent reviewer to follow the adjudicator's reasoning."  SSR 06-03p, 2006 WL 2329939, at *6.

On November 19, 2007, Mr. Darby opined that Plaintiff's moderately-severe back and hip pain would often interfere with her attention and concentration, that she was incapable of even low stress jobs, and that her medications would cause dizziness.  Tr. at 616–18.  He indicated that Plaintiff would not be able to walk one city block without resting, and that she could sit for at least 30 minutes and up to one hour, stand for 30 minutes, and sit and stand/walk for a total of less than two hours each in an eight–hour day.  Tr. at 618–19.  He further noted that Plaintiff would occasionally need to take unscheduled breaks and should avoid noise, heat, wetness, and humidity.  Tr. at 619–20.

The ALJ stated that he had considered Mr. Darby's opinion and found that it was quite conclusory and provided very little explanation of the evidence relied on in forming the opinion.  Tr. at 21.  The ALJ further found that the opinion "was without substantial support from the other evidence of record; including the treatment notes relied upon which obviously render it less persuasive."  *Id.*  He ultimately found that the opinion was not supported by objective evidence when considered in the determination of Plaintiff's RFC.  *Id.*

Plaintiff argues that the ALJ failed to provide substantial, specific reasons to dismiss Mr. Darby's opinion; however, Plaintiff's argument rests almost entirely on the grounds that Mr. Darby's opinion is consistent with Dr. Boyd's opinion.  [Entry #17 at 35–36].  Because the undersigned has already recommended a finding that the ALJ properly discounted Dr. Boyd's opinion, Plaintiff's argument is unavailing.  Furthermore, the ALJ's discussion of Mr. Darby's opinion is set against the same discussion of Plaintiff's medical history and ADLs as that of Dr. Boyd and specifically notes that the opinion is both conclusory and unsupported by Mr. Darby's treatment notes.  Plaintiff has not identified treatment notes from Mr. Darby that would support his opinion of Plaintiff's extreme functional limitations.   For these reasons, the undersigned recommends a finding that the ALJ properly evaluated Mr. Darby's opinion.

2.       The ALJ Properly Assessed Plaintiff's RFC

Plaintiff next argues the ALJ did not satisfy the requirements of SSR 96-8p in determining her RFC.  [Entry #17 at 19–22].  Specifically, she claims that the ALJ's RFC determination was flawed because he failed to include limitations on her ability to sit.  *Id* at 21–22.  The Commissioner contends the ALJ's RFC determination accounts for all of Plaintiff's credible limitations.  [Entry #18 at 21–25].

The ALJ's RFC assessment should be based on all the relevant evidence.  20 C.F.R § 404.1545(a).  Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion,

citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

Plaintiff first contends that the ALJ's decision fails to explain what, if any, restriction the ALJ placed on her ability to sit. [Entry #17 at 21–22]. She appears to recognize, however, that a lack of any sitting-related restriction in the RFC indicates that the ALJ intended to find that Plaintiff was not restricted in her ability to sit in a normal upright position. *Id.* The undersigned finds this to be the case based on a plain reading of the decision.

Plaintiff next argues that if the ALJ intended to find no sitting restriction, such a finding is not supported by substantial evidence. *Id.* at 22. In support of her argument, she cites to only one record documenting her alleged problems with sitting. *See* Tr. at 352. The record from Dr. Boyd predates Plaintiff's back surgeries and provides that if Plaintiff sat or stood for any long period of time, she had a lot of pain. *Id.* Given that Plaintiff made this complaint prior to her surgeries and made no similar complaints post-surgery, the undersigned does not find the record sufficient to demonstrate that the ALJ's RFC determination was not based on substantial evidence. The only other record evidence supporting Plaintiff's alleged sitting difficulties comes from Mr. Darby's

opinion, which the undersigned found to be reasonably discounted, and Plaintiff's own testimony. Thus, Plaintiff's allegation of error is, in part, a challenge to the ALJ's credibility determination.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher* v. *Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors

concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig* v. *Chater*, 76 F.3d 585, 591–96 (4th Cir. 1996).  The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC.  Tr. at 21.

Throughout the RFC determination, and again in his discussion of Plaintiff's credibility, the ALJ noted the limited objective findings to support Plaintiff's alleged degree of limitation.  Tr. at 19–21.  In making his credibility determination, however, the ALJ did not rely solely on the lack of objective evidence.  As he is required to do, he cited additional reasons why Plaintiff's testimony was not credible.  *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).  Most significantly, he noted conflicts between Plaintiff's testimony and her ADLs.  He referenced that Plaintiff had taken care of her two very young great grandchildren since their births.  Tr. at 21.  The ALJ also noted that although Plaintiff claimed she experienced side effects from her medications, there was no indication in the medical records of ongoing side effects from medications.  Tr. at 20.

In addition, the ALJ noted there was nothing in the medical records to substantiate Plaintiff's claims of memory loss and difficulty concentrating since her surgery. *Id.*

The ALJ's decision sets forth the grounds upon which he appropriately relied in discounting Plaintiff's subjective complaints. Because the ALJ's determination not to fully accept Plaintiff's alleged limitations, including her inability to sit for long periods, is supported by substantial evidence, the undersigned recommends finding that the ALJ properly evaluated Plaintiff's credibility and did not err in excluding her alleged sitting limitation from her RFC.

Finally, as support for her argument that the RFC determination was faulty, Plaintiff asserts without legal support that because the ALJ concluded that she had severe back-related impairments, he was necessarily required to assess her ability to sit in an upright position for prolonged periods of time. [Entry #19 at 6]. However, it was not necessary for the ALJ to prepare a function-by-function analysis for impairments that he did not find credible or supported by the record. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). In light of the lack of evidence supporting such a limitation and the ALJ's proper evaluation of Plaintiff's credibility and the opinions of Plaintiff's treaters, the undersigned recommends a finding that the ALJ's RFC determination is supported by substantial evidence.

3.    The ALJ Did Not Err in Determining Plaintiff Could Return to PRW

Plaintiff contends that the ALJ's determination that she could return to PRW as an accounting clerk does not comply with SSR 82-62.  [Entry #17 at 24–28].  Specifically, Plaintiff argues that the ALJ failed to describe how she could perform her PRW in light of her inability to sit for long periods of time.  [Entry #19 at 7].  The Commissioner responds that the ALJ made the findings required by SSR 82-62 and that it is Plaintiff's burden to prove an inability to return to PRW.  [Entry #18 at 25–28].

At the fourth step of the disability inquiry, a claimant will be found not disabled if she is capable of performing her PRW either as she performed it in the past or as it is generally required by employers in the national economy.  SSR 82-61.  The claimant bears the burden of establishing that she is incapable of performing her PRW.  *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

Social Security Ruling 82–62 requires the ALJ to determine the following when evaluating whether a claimant can perform her past relevant work:

1.    A finding of fact as to the individual's RFC;

2.    A finding of fact as to the physical and mental demands of the past job/occupation; and

3.    A finding of fact that the individual's RFC would permit a return to her past job or occupation.

SSR 86-62, 1982 WL 31386, at *4.

Here, the ALJ found that Plaintiff was capable of performing her PRW as an accounting clerk as it is generally performed in the national economy.  In doing so, he referenced the job number in the Dictionary of Occupational Titles ("DOT") and the testimony of the VE, who stated that that the job of accounting clerk was sedentary and skilled as performed in the national economy.  Tr. at 22, 47, 85.  The ALJ complied with SSR 82-62 because he made a finding of fact as to Plaintiff's RFC (*see* Tr. at 15–22), determined the physical and mental demands of Plaintiff's past work as an accounting clerk through testimony from the VE, and determined that Plaintiff's RFC would permit her to return to her PRW.  Tr. at 22.  The Commissioner may employ the services of a VE at step four of the sequential evaluation process to help determine whether a claimant can perform her PRW.  *See* 20 C.F.R. § 404.1560.  The Commissioner may rely on the general job categories of the DOT as presumptively applicable to the claimant's prior work. *DeLoache v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983).  Based on the foregoing, the undersigned recommends a finding that the ALJ properly evaluated Plaintiff's ability to return to PRW.  To the extent Plaintiff's argument is based on her contention that she cannot sit for long periods, the undersigned recommends rejecting the argument for the reasons stated in the preceding section of this Report.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and

law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

July 9, 2013                                Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).